FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 22, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KYLE S.,[1] | No.    2:21-cv-341-EFS |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION, AND REMANDING FOR FURTHER PROCEEDINGS** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Kyle S. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ did not consider the medical examiners' other offered reasons for Plaintiff's inconsistent test results, the ALJ's decision to discount the medical examiners' opinions because Plaintiff may have exaggerated his symptoms is not supported by substantial evidence. This error, amongst others, requires remand for further proceedings.

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

1

## I.   Five-Step Disability Determination

2

A five-step evaluation determines whether an adult claimant is disabled.

3  Step one assesses whether the claimant is engaged in substantial gainful activity.[2]

4  Step two assesses whether the claimant has a medically severe impairment or

5  combination of impairments that significantly limit the claimant's physical or

6  mental ability to do basic work activities.[3] Step three compares the claimant's

7  impairment or combination of impairments to several recognized by the

8  Commissioner to be so severe as to preclude substantial gainful activity.[4] Step four

9  assesses whether an impairment prevents the claimant from performing work she

10  performed in the past by determining the claimant's residual functional capacity

11  (RFC).[5] Step five assesses whether the claimant can perform other substantial

12  gainful work—work that exists in significant numbers in the national economy—

13  considering the claimant's RFC, age, education, and work experience.[6]

14

15

16

_____

17

[2] 20 C.F.R. § 404.1520(a)(4)(i), 416.920(a)(4)(i).

18

[3] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

19

[4] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

20

[5] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

21

[6] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98

22  (9th Cir. 1984).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[7] At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[8]

## II.    Background

Plaintiff filed Title 2 and 16 applications alleging disability because of depression, dependent personality disorder, anxiety disorder, posttraumatic stress disorder (PTSD), recurrent headaches, seizures, and a lower-back condition.[9] Plaintiff seeks disability for the period of August 15, 2018, to June 15, 2020. After the agency denied his applications initially and on reconsideration, Plaintiff requested a hearing before an ALJ.[10]

ALJ Donna Walker held a telephonic hearing in November 2020 during which Plaintiff, two medical experts, and a vocational expert testified.[11] Plaintiff, who was then 27 years old, testified that he had struggled in school even though he was in smaller-class sizes, he did not complete high school, he is unable to read a newspaper, and he gets flustered when stressed.[12] He testified that in June 2020

---

[7] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[8] *Id.*

[9] AR 259–68.

[10] AR 137–48, 151–56.

[11] AR 36–74.

[12] AR 60–61.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

1
2
3
4
5
6
7

he began working at a business with family and friends and that they are very flexible and patient with him, allowing him to not attend work if he has headaches or feels like he is going to have a seizure, permitting him to leave early if he gets emotionally unable to continue working, and forgiving when he commits costly mistakes or has an angry outburst.[13] Plaintiff also testified that the medication he takes for his seizures causes him to be depressed and/or angry, with loss of appetite and diminished concentration.[14]

8
9

After the hearing, the ALJ denied Plaintiff's disability applications.[15] As to the sequential disability analysis, the ALJ found:

10

- Plaintiff met the insured status requirements through June 30, 2022.

11
12

- Step one: Plaintiff had not engaged in substantial gainful activity since August 15, 2018, the alleged onset date.

13
14
15
16

- Step two: Plaintiff had the following medically determinable severe impairments: seizures, headaches, degenerative disc disease, major depressive disorder, generalized anxiety disorder, attention-deficit hyperactivity disorder, and PTSD.

17
18
19

---

20
21
22
23

[13] AR 61–67.

[14] AR 63–65.

[15] AR 12–35.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform light work with the following limitations:

    Regarding postural abilities, the claimant has the ability to perform all postural activities frequently (2/3 of the workday); except stooping (i.e., bend at the waist) is limited to occasionally (1/3 of the workday); and should never climb ladder, ropes or scaffolds. The claimant has no limitations regarding the ability to handle, finger or feel, reach in all directions, including overhead, see, hear or communicate. Regarding the environment, the claimant has no limitations, except he should avoid concentrated exposure to vibration and hazards, such as dangerous machinery and unprotected heights, open bodies of water. Regarding mental abilities, the claimant has the ability to understand, remember or apply information that is simple and routine, commensurate with SVP 2. Regarding interaction with others, the claimant would work best in an environment in proximity to, but not close cooperation, with co-workers and supervisors, and must work in an environment away from the public. With legally required breaks, the claimant has the ability to concentrate, persist and maintain pace. Regarding the ability to adapt or manage; the claimant would work best in an environment that is routine, repetitive, low pressure, low stress, and predictable, but does have the ability to respond appropriately, distinguish between acceptable and unacceptable work performance; or be aware of normal hazards and take appropriate precautions.

- Step four: Plaintiff was unable to perform past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

numbers in the national economy, such as product assembler,

assembler of electrical accessories, and routing clerk.[16]

In reaching her decision, the ALJ found:

- persuasive the reviewing opinions of Bruce Eather, Ph.D., John

  Nance, Psy.D., Desmond Tuason, M.D., and Keweli Amusa, M.D.;

- partially persuasive the reviewing opinion of Dana Harmon, Ph.D.,

  and the examining opinions of William Drenguis, M.D., and Thomas

  Genthe, Ph.D.; and

- unpersuasive the examining opinion of Catherine MacLennan, Ph.D.,

  and the reviewing opinion of Merry Alto, M.D.[17]

The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were inconsistent with the evidence.[18]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[19] Plaintiff timely appealed to the Court.

---

[16] AR 17–30.

[17] AR 24–28.

[18] AR 21–24.

[19] AR 1–6.

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[20] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[21] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[22] Moreover, because it is the role of the ALJ—and not the Court—to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[23] The Court considers the entire record.[24]

---

[20] 42 U.S.C. § 405(g).

[21] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[22] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[23] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[24] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

1     Further, the Court may not reverse an ALJ decision due to a harmless

2 error.[25] An error is harmless "where it is inconsequential to the ultimate

3 nondisability determination."[26]

## IV.    Analysis

## A.    Medical Opinions: Plaintiff establishes consequential error.

     Plaintiff argues the ALJ erred when considering whether the opinions of

Dr. Genthe and Dr. MacLennan were supported by and consistent with the record.

As discussed below, the ALJ's analysis as to these medical opinions was

inadequately explained and not supported by substantial evidence.

### 1.    Standard

     The ALJ was required to consider and evaluate the persuasiveness of the

medical opinions.[27] The factors for evaluating the persuasiveness of medical

opinions include, but are not limited to, supportability, consistency, relationship

with the claimant, and specialization.[28] Supportability and consistency are the

most important factors, and the ALJ is required to explain how both factors were

considered.[29]

---

[25] *Molina*, 674 F.3d at 1111.

[26] *Id.* at 1115 (cleaned up).

[27] 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

[28] *Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

[29] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

2.    <u>Dr. Genthe</u>

In February 2019, Dr. Genthe conducted a psychological evaluation of Plaintiff.[30] Dr. Genthe observed that Plaintiff, while cooperative, provided excessive amounts of detail in response to questions, appeared distressed, had mild difficulties following the conversation, and did not understand a proverb. Dr. Genthe diagnosed Plaintiff with major depressive disorder with anxious distress, panic disorder, PTSD, attention-deficit/hyperactivity disorder with combined presentation, and mild cannabis use disorder. Dr. Genthe opined that Plaintiff was:

- moderately limited in his abilities to learn new tasks, perform routine tasks without special supervision, be aware of normal hazards and take appropriate precautions, ask simple questions or request assistance, set realistic goals and plan independently, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision, and

- markedly limited in his abilities to adapt to changes in a routine work setting, communicate and perform effectively in a work setting, maintain appropriate behavior in a work setting, complete a normal workday and workweek without interruptions from psychologically based symptoms,

---

[30] AR 533–39.

and understand, remember, and persist in tasks by following detailed

instructions.

Dr. Genthe found that the effects on Plaintiff's basic work activities were not the

result of a substance use disorder, though he recommended a chemical dependency

assessment and vocational training or services.

The ALJ discounted Dr. Genthe's opinion because 1) Dr. Genthe noted that

malingering was a possibility, 2) Plaintiff's symptoms were not being managed by

treatment and Plaintiff's symptoms showed significant improvement with

treatment after Dr. Genthe's evaluation, and 3) Plaintiff demonstrated an ability to

recognize inappropriate behavior and apologize for it.[31]

First, as to Dr. Genthe's note that Plaintiff "tended to portray himself in an

especially negative or pathological manner,"[32] evidence that a claimant

exaggerated his symptoms, and therefore the medical opinion may not be

supported by reliable test data, was a relevant factor for the ALJ to consider when

assessing whether the medical opinion was supported by and/or consistent with the

evidence.[33] Here, Dr. Genthe conducted a Personality Assessment Inventory (PAI)

---

[31] AR 25–26.

[32] AR 539.

[33] *Tomassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989); *see also Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 n. 1 (9th Cir. 2008).

and noted that Plaintiff's scores suggested some problems in understanding or

attending appropriately to the PAI:

> There appear to have been some idiosyncratic responses to particular items, and there were also some inconsistent responses to items with highly similar content. There are several potential reasons for this pattern, including **reading difficulties, careless or random responding, confusion, attempts at impression management, or failure to follow the test instructions**.

> . . . . Certain of the [positive impression management] indicators fall outside of the normal range, suggesting that the respondent may not have answered in a completely forthright manner; the nature of his responses might lead the evaluator to form a somewhat inaccurate impression of the client based upon the style of responding described below. With respect to positive impression management, there is no evidence to suggest that the respondent was unduly defensive or motivated to portray himself as being relatively free of common shortcomings or minor faults.

> With respect to negative impression management, there are indications suggesting that the client tended to portray himself in an especially negative or pathological manner. Some deliberate distortion of the clinical picture may be present; the critical items should be reviewed to evaluate the possibility of malingering. **Also, such results often indicate a cry for help, or an extreme or exaggerated negative evaluation of oneself and one's life**. Regardless of the cause, THE TEST RESULTS POTENTIALLY INVOLVE CONSIDERABLE DISTORTION AND ARE UNLIKELY TO BE AN ACCURATE REFLECTION OF THE RESPONDENT'S OBJECTIVE CLINICAL STATUS. THIS MAKES PARTICULAR SENSE BECAUSE HE ALTERNATIVELY ANSWERED QUESTIONS AS [VERY TRUE] OR [MOSTLY TRUE].[34]

Dr. Genthe clearly questioned the PAI test results. Dr. Genthe identified not only

malingering as the possible cause, but also: a cry for help, an extreme negative self-

evaluation, reading difficulties, careless or random responding, confusion, or

---

[34] AR 539 (bolding added).

1    failure to follow the test instructions. In discounting Dr. Genthe's opinion, the ALJ

2    only mentioned the concern about malingering and did not discuss the other

3    reasons offered by Dr. Genthe. However, the record contains evidence that Plaintiff

4    had reading and learning difficulties: Plaintiff's school reports indicate that he

5    struggled at school, taking several classes pass/fail and earning a high school GPA

6    of 1.4.[35] Plus, during a separate psychological evaluation, Dr. MacLennan observed

7    that Plaintiff had a difficult time following the conversation and was confusing to

8    interview.[36] Dr. MacLennan's observations were consistent with the interview

9    notes of Social Security Administration (SSA) staff:[37]

> [Plaintiff] was polite and pleasant, participated in the interview with
> appropriate eye contact. However, he struggled a lot with
> concentration and staying on topic. I had to redirect him several times
> throughout the interview. He went into great detail about things and
> some that did not seem relevant to the question I asked. He would
> then repeat the same information he already told me once or twice
> before. The interview took two hours and in that time [Plaintiff]
> sometimes seemed to have trouble with logic and would take about
> many different things at once. He was difficult to follow sometimes.

15    On this record, which reflects that Plaintiff had reading difficulties and confusion,

16    the ALJ erred by not discussing the evidence consistent with the non-malingering

---

[35] AR 380-93.

[36] AR 438.

[37] AR 338.

reasons identified by Dr. Genthe as potential causes for Plaintiff's exaggerated symptoms and resulting inconsistent test results.[38]

Second, the ALJ discounted Dr. Genthe's opinion because Plaintiff was not receiving mental-health treatment at the time of the February 2019 psychological examination and then Plaintiff showed significant improvement after treatment. An ALJ may consider whether treatment would improve a claimant's symptoms such that he would be able to sustain fulltime work.[39] Here, as to treatment, Dr. Genthe wrote:

> At this time, his symptoms are not being managed, which are likely to interfere with his ability to initiate or maintain future employment. It is recommended that he be referred for a psychiatric consultation to review treatment options. A referral for individual counseling services is also recommended in attempts to target his mental health symptoms. From a psychological perspective, [Plaintiff's] prognosis is viewed as fair. At this time, he is unlikely to function adequately, and/or consistently in a work setting until his psychological symptoms have been managed more effectively.[40]

---

[38] *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (requiring the ALJ to consider whether a claimant's mental-health impairment caused the claimant's exaggerated symptoms); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1209–1300 (9th Cir. 1999) (discouraging "chastis[ing] one with a mental impairment for the exercise of poor judgment").

[39] Soc. Sec. Rlg. 18-3p (2018) (requiring the prescribed treatment to be expected to restore the individual's ability to engage in substantial gainful activity).

[40] AR 536.

1

2

Dr. Genthe opined that with available treatment Plaintiff would likely be impaired for 9–12 months.

3

4

5

6

7

8

9

The record reveals that Plaintiff established care for his anxiety, depression, ADHD, and other conditions with a primary care provider—Dr. Jennifer Knox—in February 2019.[41] Dr. Knox, who had also treated Plaintiff in late 2018 after a motor vehicle accident, treated Plaintiff about 5 times after the initial establishment of care in February 2019. As the ALJ highlighted, Dr. Knox's October 2019 treatment note—her final note in this record—indicated that Plaintiff's symptoms had improved.[42] The October 2019 treatment note states[43]:

10

11

12

**Problem # 1:  PSYCHOSIS (ICD-298.9) (ICD10-F29)**
Suspect psychotic disorder NOS. He appears much improved from previous visits; namely his thoughts are much more organized, as is his speech. He appears much better today. We will increase the risperdal from 1 mg bid to 1 mg qam and 2 mg qpm.

In the past the pt was so disorganized that we were not able to address nightmares and anxiety. I do not recall him mentioning this. Now, however, he is able to articulate his concerns and anxiety and nightmares are at the forefront.

13

14

15

16

Dr. Knox mentioned that Plaintiff's thoughts and speech were previously so impaired that he was unable to fully articulate his medical concerns; and Dr. Knox suspected a psychotic disorder. Consistent with Dr. Knox's statement that

17

18

[41] AR 457–59.

[42] AR 445–49, 551–54.

19

20

21

22

[43] AR 554. *See Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) (requiring that examination notes be read in their context, as "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations").

23

Plaintiff's symptoms were previously more severe, other medical records indicate that Plaintiff had poor hygiene, was verbally abusive toward staff, had abnormal thought content, or pressurized speech.[44] Given the abnormal observations by Dr. Genthe, Dr. Knox, and other providers, the ALJ must more meaningfully explain how Plaintiff's noted improvement during a single medical appointment in October provides substantial evidence of sustained improvement sufficient to discount Dr. Genthe's opinion.[45]

Finally, the ALJ discounted Dr. Genthe's opinion that Plaintiff had a marked limitation in maintaining appropriate behavior because Plaintiff demonstrated an ability to recognize his inappropriate behavior and apologize for it. Whether a medical opinion is consistent with the evidence from other medical sources and nonmedical sources is a critical factor for the ALJ to consider.[46] Here,

---

[44] AR 555–72.

[45] *See Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature of bipolar disorder that symptoms wax and wane over time."); *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").

[46] 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

in finding that Plaintiff's difficulty with maintaining appropriate behavior was not as severe as Dr. Genthe opined, the ALJ relied on Plaintiff's behavior during two medical appointments.[47] The first was a May 21, 2019 appointment with Dr. Knox, wherein Plaintiff apologized for being abrasive and losing his temper during his last appointment.[48] Although Plaintiff apologized and was friendly and cooperative with an intact memory and was redirectable, Dr. Knox noted that Plaintiff's speech was pressured and rapid, and she referred him to psychiatry.[49] The other cited record is a July 23, 2019 treatment note stating:

> Abusive behavior of staff. [Patient] counseled that we want to help him and work with him, but verbal and or physical behavior toward any staff member will not be tolerated. [Patient] verbalized understanding once more calm.
> Office visit conducted with additional help /security from Engineering staff to ensure safety of staff.[50]

That Plaintiff apologized for extreme behavior does not lessen the fact that he engaged in abusive conduct at medical appointments—conduct that would also be inappropriate in a work setting. These cited records do not offer substantial evidence supporting the ALJ's decision to discount Dr. Genthe's opinion that

---

[47] AR 25 (citing AR 557, 569).

[48] AR 569–72.

[49] AR 569–72.

[50] AR 557.

Plaintiff would have a marked limitation maintaining appropriate behavior in the workplace.

The ALJ's offered reasons for discounting Dr. Genthe's opinion are not supported by meaningful explanation or substantial evidence.

3. Dr. MacLennan

Two days after Dr. Genthe's evaluation in February 2019, Dr. MacLennan conducted a psychological evaluation of Plaintiff.[51] She reviewed some treatment records, interviewed Plaintiff, and assessed Plaintiff's mental status, finding that Plaintiff had good memory recall but poor attention and calculation, that he was able to follow a simple 3-step instruction, and that he failed to write a complete sentence. Dr. MacLennan diagnosed Plaintiff with PTSD (complex and chronic), rule out learning disabilities or neurocognitive disorder, and personality traits including dependency disorder. Dr. MacLennan noted that Plaintiff was a very poor historian and confusing to interview, as there were multiple inconsistencies in his report during the interview and he endorsed experiencing almost every symptom on a written checklist "most or all of the time."[52] Dr. MacLennan found Plaintiff's mental status was consistent with learning, attention, and calculation problems. Dr. MacLennan wrote:

> [Plaintiff] appears to have difficulty with reasoning, appears to have limited judgment and limited impulse control. He appears to lack

---

[51] AR 435–44.

[52] AR 441.

insight into his own condition. He appears unaware of and unconcerned about the effect of his behavior on others around him. He appears to have difficulty following and participating in a conversation. He appears to have difficulty with sustained concentration, pace and persistence, that would interfere with his ability to function at work.[53]

The ALJ discounted Dr. MacLennan's opinion because 1) the issue as to whether Plaintiff can work is an issue reserved to the Commissioner, 2) Plaintiff possibly exaggerated his symptoms and therefore his self-reports did not represent his actual functioning, and 3) Plaintiff demonstrated an ability to perform tasks supportive of greater capability, such as independent daily-living activities, managing appointments, and volunteering at a senior center.[54]

First, although a statement by a medical source that a claimant is "unable to work" is not controlling on the Commissioner, the ALJ was required to consider all the medical findings and other evidence supporting Dr. MacLennan's statement that Plaintiff would have difficulty functioning at work due to difficulty with sustained concentration, pace, and persistence.[55] As required, the ALJ proceeded to consider whether Dr. MacLennan's observations, findings, and Plaintiff's reported

---

[53] AR 441.

[54] AR 26–27.

[55] 20 C.F.R. §§ 404.1527(d), 416.927(d).

symptoms to Dr. MacLennan were consistent with and supported by the record.[56]

But the ALJ did so in a manner that selectively favored evidence contrary to

Dr. MacLennan's opinion.[57] While—as the ALJ highlighted—Dr. MacLennan

questioned whether Plaintiff exaggerated his inabilities, Dr. MacLennan also

questioned whether Plaintiff's inconsistent answers and confusing interview style

were the result of learning and memory barriers:

> Further assessment would help clarify to what extent his learning and
> memory are barriers that interfere with employment for him.
> Hopefully a more thorough medical workup will help determine his
> medical/physical condition. [Plaintiff] said his roommate gives him his
> check and his bills and that he . . . pays them all; he also said he can't
> do any of those things. I have no idea which is more accurate. Further
> investigation is necessary to determine whether he is able to handle
> his own funds in a responsible manner, or whether he was
> exaggerating his inability to provide reasonable and consistent
> answers to very simple questions.[58]

Dr. MacLennan's opinion that Plaintiff had difficulty with reasoning, impulse

control, insight, interactions with others, and sustained concentration, pace, and

persistence was not only based on Plaintiff's self-reports, but also on her own

---

[56] *Id.* §§ 404.1520c, 416.920c; *Lingenfelter*, 504 F.3d at 1042 (recognizing the ALJ is

to consider the consistency of the medical opinion with the record as a whole).

[57] *See also Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (disallowing the

ALJ from cherry picking evidence to support a conclusion that contradicts the

overall diagnostic record).

[58] AR 442.

observations and interactions with Plaintiff, the mental-status examination, and review of three medical records from 2018.[59] Dr. MacLennan's observations and findings were also consistent with several observations and findings by treatment providers that Plaintiff had tangential talking and thought-process, poor hygiene, and inability to focus. [60] And, as noted above, SSA staff mentioned that although Plaintiff was polite and pleasant during the interview, he struggled with concentration, staying on topic, and giving too much detail.[61]

Instead of meaningfully discussing the evidence supporting Dr. MacLennan's opinion, the ALJ focused on Dr. MacLennan's comment that Plaintiff may be "exaggerating his inability to provide reasonable and consistent answers to very simple questions": a comment prefaced with Dr. MacLennan's recommendation that "[f]urther assessment would help clarify to what extent [Plaintiff's] learning and memory are barriers that interfere with employment for him."[62] Without more record development or discussion by the ALJ as to why

---

[59] *See Buck*, 869 F.3d at 1049 (Psychologist's opinion was based on a clinical interview and mental status evaluation and partially relied on the claimant's self-reports; partial reliance on self-reported symptoms was not a valid reason to reject the opinion.).

[60] *See, e.g.*, AR 450–52, 457–59, 565–68, 577–78, 580–81.

[61] AR 338.

[62] AR 442.

Dr. MacLennan's opinion was inconsistent with and unsupported by the record, the ALJ's analysis is not supported by substantial evidence.

Finally, the ALJ discounted Dr. MacLennan's opinion because it was inconsistent with Plaintiff's ability to perform tasks indicative of greater capacity, including independent activities of daily living, managing his appointments, and volunteering at a senior center. An ALJ may consider whether the medical opinion is inconsistent with the claimant's level of activity.[63] However, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."[64] As to self-care and daily chores, Plaintiff reported to Dr. MacLennan that he could perform self-care and chores, although he was afraid of showering. Dr. MacLennan did question whether Plaintiff had the ability to manage paying bills because he did not demonstrate the ability to manage such tasks during the examination; instead, Dr. MacLennan stated Plaintiff's "mental status was consistent with learning problems, attention and calculation problems."[65] And contrary to Plaintiff's self-report that he adequately performed

---

[63] *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

[64] *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (cleaned up).

[65] AR 441. An ALJ must consider the basis for the limitations and not discount because of nonrelevant normal findings. *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (finding the ALJ erred by rejecting the claimant's symptoms

1
2
3
4

self-care, the record reflects that Plaintiff was homeless for about 6 weeks during the relevant period and that he had difficulties with hygiene.[66] This self-care record does not provide substantial evidence supporting the ALJ's decision to discount Dr. MacLennan's opinion.

5
6
7
8
9
10
11
12

 As to managing appointments, the record reflects that Plaintiff attended appointments for physical and mental medical conditions during the relevant period fairly consistently until October 18, 2019, and then there is a break in the medical records until Plaintiff sought emergency treatment for a seizure and resulting headache in May 2020.[67] Plaintiff's medical treatment reflects an ability to perform activities within a schedule and maintain regular attendance. However, Dr. MacLennan's opined difficulties were not centered on any inability to show up for work but rather were based on Plaintiff's (in)ability to function while *at* the

13
14
15
16
17

resulting from anxiety, depressive disorder, and PTSD on the basis that claimant performed cognitively well during examination and had a generally pleasant demeanor).

18
19
20
21

[66] AR 562–68. *See Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) (recognizing that the fact the claimant "could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period").

22

[67] *See, e.g.*, AR 551–54, 592–93.

23

workplace.[68] Questions remain whether, for instance, he would distract coworkers and could adapt to work situations, control his impulses, and/or sustain concentration, pace, and persistence. The medical record reflects that Plaintiff struggled with maintaining appropriate behavior and communicating effectively, given that he was abrasive with medical staff, had pressured speech, and had a seizure in April 2019 causing confusion.[69] On remand, the ALJ must meaningfully explain why Plaintiff's ability to manage medical appointments is inconsistent with Dr. MacLellan's opined limitations.

Finally, the ALJ found Dr. MacLellan's opinion inconsistent with Plaintiff's report that he helps a woman at the senior center, where he also plays Beethoven on the piano. But Plaintiff also advised Dr. MacLennan that he does not really have friends, does not have a phone, does not go to his sister's house although he lives across the street from his sister, and he does not go to church.[70] Without more details as to how often Plaintiff visits the senior center and what he does there,

---

[68] Like Dr. MacLennan, Dr. Genthe's marked limitations pertained to Plaintiff's adaptive, communication, behavioral, and concentration/pace/persistence abilities. As to Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and being punctual within customary tolerances without special supervision, Dr. Genthe only opined a moderate limitation. AR 536.

[69] *See, e.g.*, AR 511–13, 516–17, 573–83.

[70] AR 440.

1

2

3

this single, vague reference to helping a woman at the senior center and playing the piano does not constitute substantial evidence supporting the ALJ's decision to discount Dr. MacLennan's opinion.[71]

4

    4.    <u>Consequential Error</u>

5

6

7

8

9

10

The ALJ erred when analyzing Dr. Genthe's and Dr. MacLennan's examining opinions. These errors are consequential because the vocational expert testified that an individual who has pressured or disorganized speech may negatively affect their own or coworker's productivity.[72] And to maintain competitive employment an employee must maintain appropriate behavior and adequate concentration, persistence, and pace.

11

12

13

14

15

16

17

18

[71] *See Smolen v. Chater*, 80 F.3d 1273, 1287 n.7 (9th Cir. 1996) (recognizing that "many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication"); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (emphasizing that simply because a claimant can carry on certain daily activities does not detract from his credibility as to his overall disability if the activities do not consume a substantial part of the day and do not reflect the ability to sustain fulltime work).

19

20

21

22

23

[72] AR 71–73. Because these errors are consequential, the Court need not address Plaintiff's argument that the ALJ failed to incorporate Dr. Nance's testimony that there was a potential for Plaintiff to distract coworkers because of his speech and thought patterns. *See* AR 58–59.

1

**B.    Symptom Reports: The ALJ must reconsider on remand.**

2

3    Plaintiff argues the ALJ failed to provide valid reasons for discounting his

4    symptom reports. Because the case is being remanded for further consideration of

5    the medical opinions, the Court does not address Plaintiff's symptom-report

6    arguments in full but does address some of Plaintiff's concerns about the ALJ's

7    analysis.

8    First, the ALJ discounted Plaintiff's demonstrated irritability and aggressive

9    and uncooperative behavior because Plaintiff "himself attributed [such behavior]

10   . . . to the passing of his father in March 2019."[73] Because there was concern by

11   Dr. MacLennan and Dr. Knox whether Plaintiff had true insight into the nature of

12   his mental-health conditions, relying on Plaintiff's own attribution as to the cause

13   for his irritability and aggressive behavior is questionable, particularly as Dr. Knox

14   questioned whether Plaintiff's anger was a side-effect of the seizure medication.[74]

15   Moreover, Dr. Genthe and Dr. MacLennan evaluated Plaintiff before his father

16   passed and both examiners expressed concern about Plaintiff's ability to maintain

17   behavior at the workplace.

18   The ALJ also discounted Plaintiff's symptoms because a treating provider

19   questioned whether Plaintiff's behavior was caused by drug use.[75] Drug-seeking

20

21   [73] AR 23.

22   [74] AR 511.

23   [75] AR 23 (citing AR 575).

behavior can be a clear and convincing reason to discount a claimant's reported symptoms.[76] Yet, the ALJ must consider this drug-use speculation in the context of the record. The treatment record noted that Plaintiff's speech was pressured, and he was repeating himself, pacing, irritable, and angry.[77] Dr. Knox wrote that Plaintiff "[s]tates he threw his sertraline away because it didn't work. Today I am concerned for either drug use or mania," and Dr. Knox mentions that Plaintiff became upset when he did not receive opiates for his back pain.[78] Then, during an appointment two weeks later with Dr. Knox for a hand fracture incurred after Plaintiff hit a metal object when upset, Plaintiff's speech was again pressured and rapid despite being friendly, cooperative, and redirectable.[79] Dr. Knox referred Plaintiff to psychiatry and continued Plaintiff on Valium because Plaintiff was "far too activated and anxious to think rationally [and] interestingly . . . does not

---

[76] *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that evidence of drug seeking behavior undermines a claimant's reported symptoms); *Gray v. Comm'r, of Soc. Sec.*, 365 F. App'x 60, 63 (9th Cir. 2010) (recognizing that evidence of drug-seeking behavior is a valid reason for discounting a claimant's symptom claims).

[77] AR 573–76.

[78] AR 575. *See also* AR 577 (stating he has been working very hard for last 18 days); AR 581 (mentioning that Plaintiff is digging ditches).

[79] AR 569–72.

appear manic despite incredibly pressured speech.[80] And during an emergency-room visit during this same period, the medical record indicates a suspicion that an underlying mental health disorder was undiagnosed and untreated.[81] Moreover, the drug screens of record do not reflect drug use beyond Plaintiff's admitted marijuana use and prescribed medications.[82] On this record, without more explanation by the ALJ, the mention that a treating provider questioned whether Plaintiff's behavior was caused by either drug use or mania does not constitute substantial evidence to discount Plaintiff's symptom reports.

Also, when considering Plaintiff's symptom reports, the ALJ must reassess whether Plaintiff's activities of daily living are inconsistent with his reported symptoms. The ALJ must more meaningfully explain why the ability to perform self-care, attend appointments, and engage in very limited social activities are inconsistent with Plaintiff's symptom reports, including that he requires instructions to be repeated at his sheltered employment and that his seizure medication causes side effects such as anger and depression.

Finally, reports of improvement in mental health "must be interpreted with an understanding of the patient's overall well-being and the nature of [his] symptoms," as well as with an awareness that "improved functioning while being

---

[80] AR 571.

[81] AR 581.

[82] AR 416, 601, 602.

treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."[83]

## C.   Remand: Further proceedings are necessary.

Plaintiff asks for a payment of benefits for the closed period on remand. However, the ALJ's errors when analyzing the medical records require further proceedings on remand, because disability is not clearly established for this closed period.[84]

On remand, the ALJ is to develop the record by 1) obtaining medical records through June 15, 2021,[85] 2) requesting a statement from a supervisor at Plaintiff's sheltered employment,[86] 3) requesting a medical opinion from Dr. Knox (or another

---

[83] *Garrison*, 759 F.3d at 1017 (cleaned up). *See also Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982) (recognizing that the ability to engage in sheltered work does not correspond to an ability to engage in fulltime gainful work).

[84] *See Leon v. Berryhill*, 800 F.3d 1041, 1045 (9th Cir. 2017); *Garrison*, 759 F.3d at 1020.

[85] Obtaining medical records for a one-year period after the closed disability period will assist the ALJ in determining whether Plaintiff's improvement at the October 2019 appointment is consistent with sustained improvement or temporary improvement.

[86] *Hearings, Appeals, and Litigation Law Manual* I-2-5-62 (obtaining additional evidence from non-medical sources).

treating provider), 4) ordering intelligence testing to ascertain Plaintiff's reading and comprehension abilities, and 5) obtaining, if necessary, new testimony from a psychological expert.[87] The ALJ is to then reconsider the medical evidence, Plaintiff's symptom reports, and reevaluate the sequential process.

## V.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment, **ECF No. 11**, is **GRANTED**.

2. The Commissioner's Motion for Summary Judgment, **ECF No. 12**, is **DENIED**.

3. The Clerk's Office shall enter **JUDGMENT** in favor of **Plaintiff**.

4. This matter is **REVERSED and REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

---

[87] The ALJ always has a special duty to fully and fairly develop the record" to make a fair determination as to disability. *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (cleaned up). *See* 20 C.F.R. §§ 404.1512(b), 416.912(b).

ORDER RULING footer

5.    The case shall be **CLOSED**.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 22nd day of November 2022.

_____
EDWARD F. SHEA
Senior United States District Judge